


PHOENIXVILLE POST OFFICE


**UNITED STATES**
**POSTAL SERVICE**

Date: April 22, 1996

Name:  Kenneth Hoffman
SSN:   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
       PTF Letter Carrier

**SUBJECT:**    **SEPARATION/DISQUALIFICATION DURING PROBATIONARY**
                **PERIOD**

This is official notice that you will be separated from the Postal Service effective with the close of business on  Monday,  April 22, 1996.

This separation action during your probationary period is taken for the following reasons:

**CHARGE:**    **FAILURE TO MEET THE QUALIFICATIONS AND TERMS OF YOUR**
               **EMPLOYMENT.**

The probationary period is an extension of the examination process.  A trial on the job is the only way Management can assess an employees suitability for employment.  Since you joined the Postal Service on February 3, 1996, you were sent for training at the Letter Carrier Academy in the PEDC and you have been given continuous on the job training, (OJT) since your hiring.  However, in spite of our efforts on your behalf, you are unable to properly perform the duties expected of all letter carriers.  In addition you have not improved your office/street time and you still do not routinely check the 3982 "Notification of Forwarding Orders."  Your actions result in inefficient mail service.  You were informed at the time of your appointment that your retention in the employ of the U.S. Postal Service was conditional upon your successful completion of this probationary period.  To date, you have failed to properly perform the duties of your position of letter carrier.  Therefore, your separation is warranted.

All government property such as the identification badge, locker key must be returned before any money due will be paid.

*Jeffy S. Schoch*
Signature of Official

Jeffrey S. Schoch
Postmaster

116 GAY STREET
PHOENIXVILLE, PA 19460-9998
(610) 933-2244

A-1

THIS IS AN IMPORTANT RECORD
SAFEGUARD IT.

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|

**PERSONAL DATA**

1. LAST NAME · FIRST NAME · MIDDLE NAME
HOFFMAN,    Kenneth    Lee

2. SERVICE NUMBER
B 47 26 81

3. SOCIAL SECURITY NUMBER
196  38  6019

4. DEPARTMENT, COMPONENT AND BRANCH OR CLASS
U.S. NAVY - USN

5a. GRADE, RATE OR RANK
SN

5b. PAY GRADE
E3

6. DATE OF RANK
DAY 09  MONTH SEP  YEAR 70

7. U.S. CITIZEN
[XX] YES  [ ] NO

8. PLACE OF BIRTH (City and State or Country)
POTTSTOWN PA.

9. DATE OF BIRTH
DAY 07  MONTH MAR  YEAR 51

**SELECTIVE SERVICE DATA**

a. SELECTIVE SERVICE NUMBER
360  285  10  164

b. SELECTIVE SERVICE LOCAL BOARD NUMBER, CITY, COUNTY, STATE AND ZIP CODE
#28 READING PA.

c. DATE INDUCTED
DAY ---  MONTH ---  YEAR ---

**TRANSFER OR DISCHARGE DATA**

10. TYPE OF TRANSFER OR DISCHARGE
DISCHARGE

11. STATION OR INSTALLATION AT WHICH EFFECTED
NAVAL HOSPITAL, PHILADELPHIA PA.

6. REASON AND AUTHORITY
BUPERSMAN 3850280-273-Physical Disability
Entitled To Receive Severance Pay

c. EFFECTIVE DATE
DAY 14  MONTH SEP  YEAR 71

12. LAST DUTY ASSIGNMENT AND MAJOR COMMAND
USS MARIAS

13a. CHARACTER OF SERVICE
HONORABLE

b. TYPE OF CERTIFICATE ISSUED
DD256N

14. DISTRICT, AREA COMMAND OR CORPS TO WHICH RESERVIST TRANSFERRED
N.A.

15. REENLISTMENT CODE
RE-4

16. TERMINAL DATE OF RESERVE/UMTS OBLIGATION
DAY ---  MONTH ---  YEAR ---

17. CURRENT ACTIVE SERVICE OTHER THAN BY INDUCTION
a. SOURCE OF ENTRY
[XX] ENLISTED (First Enlistment)  [ ] ENLISTED (Prior Service)  [ ] REENLISTED
[ ] OTHER

b. TERM OF SERVICE (Years)
04

c. DATE OF ENTRY
DAY 12  MONTH DEC  YEAR 69

**SERVICE DATA**

18. PRIOR REGULAR ENLISTMENTS
ONE

19. GRADE, RATE OR RANK AT TIME OF ENTRY INTO CURRENT ACTIVE SVC
SR

20. PLACE OF ENTRY INTO CURRENT ACTIVE SERVICE (City and State)
READING PA.

21. HOME OF RECORD AT TIME OF ENTRY INTO ACTIVE SERVICE (Street, RFD, City, County, State and ZIP Code)
DOUGLASVILLE PA.

22. STATEMENT OF SERVICE

| | YEARS | MONTHS | DAYS |
|---|---|---|---|
| (1) NET SERVICE THIS PERIOD | 01 | 09 | 03 |
| (2) OTHER SERVICE | 00 | 01 | 06 |
| (3) TOTAL (Line (1) plus Line (2)) | 01 | 10 | 09 |
| b. TOTAL ACTIVE SERVICE | 01 | 09 | 03 |
| c. FOREIGN AND/OR SEA SERVICE | 00 | 10 | 09 |

23. SPECIALTY NUMBER & TITLE
N.A.

b. RELATED CIVILIAN OCCUPATION AND D.O.T. NUMBER
N.A.

24. DECORATIONS, MEDALS, BADGES, COMMENDATIONS, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED
NATIONAL DEFENSE SERVICE MEDAL

25. EDUCATION AND TRAINING COMPLETED
NONE

**VA AND EMP. SERVICE DATA**

26a. NON-PAY PERIODS/TIME LOST (Preceding Two Years)
T/L    NONE
EXLV   NONE

b. DAYS ACCRUED LEAVE PAID
00

27a. INSURANCE IN FORCE (NSLI or USGLI)
[ ] YES  [XX] NO

b. AMOUNT OF ALLOTMENT
$ ---

c. MONTH ALLOTMENT DISCONTINUED
---

28. VA CLAIM NUMBER
C- 

29. SERVICEMEN'S GROUP LIFE INSURANCE COVERAGE
[XX] $15,000  [ ] $5,000  [ ] NONE

**REMARKS**

30. REMARKS  HIGH SCHOOL  04YRS
HOFFMAN has executed a claim for compensation pension hospitalization
to be filed with Veterans Administration.

PAID $723.60 DISABILITY SEVR PAY ( 180.90 x 2 x 2)

**AUTHENTICATION**

31. PERMANENT ADDRESS FOR MAILING PURPOSES AFTER TRANSFER OR DISCHARGE (Street, RFD, City, County, State and ZIP Code)
BOX 18
Douglasville Pa.  19518

32. SIGNATURE OF PERSON BEING TRANSFERRED OR DISCHARGED
Member not available for
signature

33. TYPED NAME, GRADE AND TITLE OF PREPARING OFFICER
R.A. THARPE HMCM USN HEAD ENL PERS
BRANCH BY DIRECTION OF THE C.O.

34. SIGNATURE OF OFFICER AUTHORIZED TO SIGN

DD FORM 214N
S/N 0102-002-0200

PREVIOUS EDITION IS OBSOLETE  RECORDED IN C

A-2

ARMED FORCES OF THE UNITED STATES
REPORT OF TRANSFER OR DISCHARGE

2

  **UNITED STATES POSTAL SERVICE**™ **Employee Evaluation and/or Probationary Report**
*(See Instructions on Reverse)*

| 1. Employee's Name *(First, MI, Last)* | 2. Employee Social Security Number |
|---|---|
| KENNETH HOFFMAN | 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 |

| 3. Title | 4. Pay Location | 5. Appointment Date | 6. Date Probationary Period Ends |
|---|---|---|---|
| PTF CARRIER | 000 | 02/03/96 | 5/3/96 |

| 7a. Complete 30-Day Report By: | 8a. Complete 60-Day Report By: | 9a. Complete 80-Day Report By: | 10a. Complete Year End Report By: |
|---|---|---|---|
| 03/3/96 | 4/3/96 | 4/23/96 | 5/3/96 |

| 7b. Enter Factor Rating *(O, S, U, NO)* | 8b. Enter Factor Rating *(O, S, U, NO)* | 9b. Enter Factor Rating *(O, S, U, NO)* | 10b. Enter Factor Rating *(O, S, U, NO)* |
|---|---|---|---|
| A _✓_ B _✓_ C _✓_ D _S_ E _✓_ F _✓_ | A _✓_ B _✓_ C _✓_ D _S_ E _S_ F _✓_ | A _✓_ B _✓_ C _✓_ D _S_ E _S_ F _✓_ | A ___ B ___ C ___ D ___ E ___ F ___ |

| 7c. Employee's Initials | 8c. Employee's Initials | 9c. Employee's Initials | 10c. Employee's Initials |
|---|---|---|---|
| KLH | KLH | KLH | |

| 11. Supervisor's Signature and Date *(End of Probationary Period or Year End)* | 12. Employee's Signature and Date *(Does Not Indicate Agreement)* |
|---|---|
| Ken Sands  4-22-96 | Kenneth L Hoffman |

Listed below are the factors on which you are to evaluate the employee. Next to each factor are examples of behaviors that would describe performance at the *SATISFACTORY* level. These are provided as reference points for evaluating performance. Performance substantially above the performance described at the *SATISFACTORY* level would be rated *OUTSTANDING*, while performance substantially below the *SATISFACTORY* level would be rated *UNACCEPTABLE*. Please indicate your rating of *OUTSTANDING*, *SATISFACTORY*, or *UNACCEPTABLE* for each factor by entering the appropriate letters (O, S, or U) in the boxes in items 7b through 10b. If you have not observed how this person performed on a given factor, or if the factor is not relevant to the position which you are rating, enter "NO" *(NOT OBSERVED)*.

**O = OUTSTANDING     S = SATISFACTORY     U = UNACCEPTABLE     NO = NOT OBSERVED**

| Factor | Examples of Satisfactory Performance Levels |
|---|---|
| **A. Work Quantity** | ■ Works at a sufficient speed to keep up with the amount of work required by the position.<br>■ Accomplishes tasks in an efficient and timely manner.<br>■ Makes productive use of time when completing assignments. |
| **B. Work Quality** | ■ Makes few errors or mistakes.<br>■ Performs work which meets the expectations of the position.<br>■ Works in a careful, alert, and conscientious manner to ensure the accuracy and completeness of the work performed. |
| **C. Dependability** | ■ Completes work assignments without unnecessary supervision.<br>■ Takes responsibility for completing his/her own work.<br>■ Reports to work on time.<br>■ Demonstrates satisfactory attendance. |
| **D. Work Relations** | ■ Maintains positive working relationships with others.<br>■ Works harmoniously with others in getting the work done.<br>■ Cooperates well with co-workers, supervisors, and others with whom he/she comes into contact. |
| **E. Work Methods** | ■ Handles equipment and/or work materials in an appropriate manner.<br>■ Consistently observes proper safety rules and practices.<br>■ Understands and follows oral and/or written instructions. |
| **F. Personal Conduct** | ■ Conducts himself/herself in a manner appropriate to the work setting.<br>■ Maintains an appropriate appearance for the position.<br>■ Demonstrates a positive approach toward work, co-workers, and supervisors.<br>■ Demonstrates a willingness to handle all assignments.<br>■ Demonstrates flexibility in moving from one task to another as needed. |

Have Expectations Been Jointly Discussed?

☑ Yes   ☐ No     Initials _____ 2-16-96   *(Supervisor)*   _____ *(Employee)*

Would You Recommend This Person for Retention or Rehire?

☐ Yes   ☒ No     Initials: _____ *(Supervisor)*

Please Explain or Provide Additional Comments Below:

Mr. Hoffman didn't meet the performance goals of this office

---

PS Form **1750**, August 1994                    A-3                    **1 - Forward To Designated Postal Office**

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
PHILADELPHIA DISTRICT OFFICE
21 South 5th Street, Suite 400
Philadelphia, PA 19106-2515

- - -

KENNETH L. HOFFMAN,  : EEOC Hearing No.
          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X
   Complainant  :

    vs.     :

JOHN E. POTTER,   : AGENCY No.
Postmaster General,   4-C-175-1060-96
U.S. Postal Service,  :

   Agency   :

- - -

Tuesday, December 18, 2001
Commencing at 10:40 a.m.

- - -

United States Postal Service
1000 West Valley Forge Road
Southeastern, Pennsylvania

- - -

BEFORE: JULIE PROCOPIOW-TODD, Administrative Judge

- - -

FARRELL COURT REPORTING
3223 Polk Road
Norristown, Pennsylvania 19403
(610) 584-8787

- - -



1          JOHN MILLER - DIRECT

2          sworn, was examined as follows:

3                    - - -

4                    MS. TODD:  Thank you.

5          I believe Ms. Vigilante has some questions

6          for you.

7                    DIRECT EXAMINATION

8    BY MS. VIGILANTE:

9    Q.      Mr. Miller, thank you for being here and for

10   being cooperative.

11   A.      Okay.

12   Q.      We're here today to take some testimony on

13   the issues Judge Todd has indicated to you.

14                    Do you recall working with

15   Mr. Hoffman?

16   A.      Well, everybody -- when you first start, you

17   kind of get thrown around everywhere, so we would

18   occasionally work with each other, yes.

19   Q.      Okay.  So, you can recognize him, but you

20   don't --

21   A.      Yes, definitely.  No doubt about it.

22   Q.      Okay.  And while you worked with

23   Mr. Hoffman, did you ever have the opportunity to

24   hear remarks such as "coo-coo" or "I can't take the

FARRELL COURT REPORTING  (610) 584-8787

A-5

46

JOHN MILLER - DIRECT

1

2  stress" in his presence directed at some sort of

3  issue?

4  A.      I know I've heard the coo-coo one on the

5  workroom floor, and there may have been other

6  comments, too, but I can't remember specifically what

7  those were.

8  Q.      Um-hmm.  Do you remember them being made in

9  the presence of Mr. Hoffman, or do you just remember

10  the comments?

11  A.      No.  This has been a while, but to the best

12  of my recollection, these were things that were said

13  on the workroom floor with all the workers there.

14  Q.      Okay.  Including Mr. Hoffman?

15  A.      I would assume so, yes.  These are during

16  the day, during the sorting part of the day when

17  everybody's there.

18  Q.      Okay.  And do you also have a recollection

19  of whether or not management or supervisors were

20  present while these kinds of comments were made?

21  A.      This would be made right on the workroom

22  floor, so they would have to be, yes.

23  Q.      But do you have a specific recollection?

24  A.      It appears to me that anything that was

FARRELL COURT REPORTING  (610) 584-8787

JAMES CASSANO - DIRECT

1

2    in his presence either.  I just don't recall.

3    Q.        Okay.  Did you form any sort of impression

4    about Mr. Hoffman's nervousness or anxiety at the

5    time that he was assigned as a trainee?

6    A.        You know, this is five years ago, and I'm

7    trying to remember as well as I can.  There's only

8    one time I can remember that he was -- that I

9    specifically remember him being nervous was when he

10   was casing, I think, another route one day, and if I

11   remember correctly, it was because he was casing and

12   he hadn't had much of an opportunity to do so.

13   Q.        And do you recall whether or not he was

14   being watched by the supervisors at that time?

15   A.        No.

16   Q.        No?

17   A.        No.

18   Q.        Okay.  Do you know -- or do you recall

19   whether or not when you heard the term "coo-coo"

20   used or -- and if there's any other terms, I would

21   like you to tell us about them -- whether they were

22   used in the presence of supervisors?

23   A.        There was another term I heard as "Waldo."

24   I'm not sure what the significance of that was, and

FARRELL COURT REPORTING  (610) 584-8787

```
1                    JAMES CASSANO - DIRECT
```

I do believe it was in reference to Mr. Hoffman.

Q.      How about "Rambo," did you ever hear that?

A.      No, not -- I've heard that, yeah, but not in
reference to Mr. Hoffman, no.

Q.      Um-hmm.

A.      And what was the other part of the question?
I'm sorry.

Q.      In the presence of supervisors.

A.      Specifically, no.  Can I imagine that they
weren't -- I'm sure -- specifically, no.  I would
imagine that there were supervisors around at times,
but I can't say for sure.

Q.      Who assigned, if you recall, Mr. Hoffman to
assist you with the Route 11 duties at that time?

A.      I don't recall.  We've been through so many
supervisors in that office.

Q.      Um-hmm.

                MS. VIGILANTE:  I don't have
            anything further at this point.  I may have
            some follow-up.

                MS. TODD:  Thank you,
            Miss Vigilante.  Mr. Hoffman?

                MR. HOFFMAN:  I have no

                FARRELL COURT REPORTING  (610) 584-8787


                            A-8
```

135

1                    KENNETH HOFFMAN - DIRECT

2    Q.        February 16th.

3    A.        The 2nd I started, but then I went to the

4    Post Office on the 16th.

5    Q.        Okay.  Are you with me?

6    A.        Okay.

7    Q.        And what happened when you arrived at the

8    Phoenixville Post Office for your orientation, we'll

9    call it, and to begin employment?  Do you recall that

10   day?

11   A.        Yeah.

12   Q.        Who did you meet with?

13   A.        Yes, I do.  The supervisor, Mr. -- what is

14   it?

15   Q.        Bonner?

16   A.        Bonner.  He took me into a room, and he sat

17   down with his piece of paper and he went over all

18   these policies.

19                    Well, don't get me wrong.

20   Everybody has policies, and I went through policies

21   all my life, but, I mean, it was just the way that

22   I -- the way that he presented himself to me like,

23   "Do you understand," and this and that.

24                    I mean, he was -- it was

                FARRELL COURT REPORTING  (610) 584-8787

142

1          KENNETH HOFFMAN - DIRECT

2    kind of stuff out in the presence of the supervisor,

3    uhm, that kind of upset me.  I just couldn't

4    understand why that kind of behavior was acceptable

5    there in that work place.  It just --

6    Q.      It was --

7    A.        It was no more than if it was a black person

8    or somebody's hollering out black slur words all day

9    long.  You know, it hurt me.  I couldn't understand

10   why they were hollering this stuff, "coo-coo" and, "I

11   can't take the stress," you know.

12   Q.      You found it offensive?

13   A.        Of course, yeah.

14   Q.      Did you point it out to anyone in

15   supervision or was it --

16   A.        Well, I'll tell you something, because I --

17   after they -- after they left me go, I went in the

18   office and I nicely told them that besides all this

19   other stuff that they did to me, I pointed out, how

20   do you expect to even concentrate to do the job the

21   short time that I had in for casing, and these

22   fellows hollering out "coo-coo" and "I can't take the

23   stress," and everything, I told them after they left

24   me go I didn't want to say anything at that present

FARRELL COURT REPORTING  (610) 584-8787

A-10

143

1                    KENNETH HOFFMAN - DIRECT

2    time because I have to work with these fellows.

3    These fellows were training me.

4    Q.        Um-hmm.

5    A.        Sometimes you got to swallow a little bit or

6    leave things go in one ear and right out the other.

7    Quite frankly, it was still hurtful.

8                           I didn't want management to

9    look down at me as being a troublemaker or cry baby.

10   I'm under probation.  That's why I didn't run up and

11   cry to them.  You know, my pride.

12   Q.        Well, that's understandable.

13                          Can you refer to your calendar

14   on your April 8th?  Does your calendar indicate to

15   you on what date Mr. Bonsall and Mr. Marcantonio were

16   sent for DPS training?

17   A.        Yes.  They were sent on the 8th of April

18   there.

19   Q.        And did you write that at the same time that

20   it happened?  How did you become aware that they were

21   sent to DPS?

22   A.        From another postal -- another man came

23   up to me and said, "How come you didn't go to the

24   training?  The other two young fellows did," you

                FARRELL COURT REPORTING  (610) 584-8787

                              A-11

```
1                    KENNETH HOFFMAN - CROSS
2    Q.        This is your case.  This is a case of what
3    you believe to be discrimination.
4    A.        Sometimes I sound harsh.
5    Q.        This is very normal.
6                         Mr. Hoffman, do you claim to
7    have a mental disability -- or mental disorder or an
8    anxiety disorder?  Is that what you claim to have?
9    A.        Have?
10   Q.        Yes.
11   A.        I certainly do, yeah, sure.
12   Q.        Did you tell anyone?  Did you tell Mr. Sands
13   that you had it?
14   A.        Oh, wait a minute.  Did I claim back then?
15   Q.        Yes.
16   A.        No.  I didn't claim back then.  I know I
17   didn't have no -- why would I tell them?  I mean --
18   Q.        I'm asking you if you told anyone.
19   A.        Did I claim that I had a what?
20   Q.        Do you claim now -- are you claiming that
21   you actually have an anxiety disorder?  Is this
22   something that you've been diagnosed with?
23   A.        Yes.
24   Q.        When were you diagnosed with that?
```

157

```
1                    KENNETH HOFFMAN - CROSS

2    A.        When I got out of the service.

3    Q.        Approximately.

4                         MS. VIGILANTE:  When he got

5              out of the service.

6    BY MS. TODD:

7    Q.        Is that what your preference is based on?

8    A.        I'm not trying to be smart to you or

9    anything.

10   Q.        Just so I'm clear for the record, your

11   Veterans preference is based on your anxiety

12   disorder; is that correct?

13   A.        That's correct.

14   Q.        Do you think it affected your being able

15   to work at the Postal Service?  Did it affect your

16   casing ability?

17   A.        No.

18   Q.        You don't believe that it did?

19   A.        No, no, because at that time I wasn't as --

20   I was under medication and I was -- I worked for 25

21   years after I got out of the service.

22   Q.        You were on medication?

23   A.        Even without medications, and I held jobs.

24   Q.        And you were on a medication for that
```

214

1                     KEVIN CEPKO - CROSS

2                     MR. HOFFMAN:  Yeah.  I just

3          have very few questions.

4                     CROSS EXAMINATION

5     BY MR. HOFFMAN:

6     Q.          You talked about working in the office as a

7     204-B.  Did Mr. Hoffman ever approach you and ask you

8     to change the labels on Route 11?

9     A.          Not that I recall.

10    Q.          Did you, while you were there, follow what

11    you would consider the normal course in training new

12    employees?  Is that how you were trained when you

13    were a carrier?

14                     You mentioned delivering of

15    part of a route one day and then adding to it or your

16    shelf configuration, learning how to case on that.

17    Is that how you were taught to do it?

18    A.          No.  I -- truthfully, actually, the way I

19    was taught, they drove me around the route and they

20    had it set up for me and they just said, "There.

21    Go."

22                     That was back in the day.

23    It was, "Follow the mail."  That's what it was.

24    Q.          Okay.  Did Mr. Hoffman ever come to you and

                FARRELL COURT REPORTING  (610) 584-8787

                              A-14

                         KEVIN CEPKO - CROSS

1    complain about being harassed on the floor, if you

2    can recall?

3    A.        No.  I don't recall.

4    Q.        Did Mr. Sands ever mention Mr. Hoffman's age

5    at all, about getting rid of him because of his age

6    to you?

7    A.        No.

8    Q.        When you talk in terms of -- and this is the

9    last question that I have -- of -- no.

10                       MR. HOFFMAN:  I guess I have

11             no further questions.

12                       MS. TODD:  Thank you.

13             Miss Vigilante, any Redirect?

14                       MS. VIGILANTE:  No follow-up.

15   BY MS. TODD:

16   Q.        Thank you, Mr. Cepko, for coming to testify

17   today.  You're excused as a witness at this time.

18                       You're prohibited from

19   discussing your testimony with anyone.  Is that

20   clear?

21   A.        Exactly.

22   Q.        All right.  Thank you.

23                            - - -

239

1                    JEFFREY SCHOCH - DIRECT

2    A.       Without seeing the whole thing.  I mean,

3    if you just turn to a page, you couldn't tell unless

4    you're looking at the whole package.

5    Q.       Okay.

6    A.       I don't know, you know, what was asked for.

7    Like I said, you have certain reports.  You can pull

8    up everything on one person if you wanted on

9    individuals days for the whole office.

10   Q.       Okay.

11                    MS. VIGILANTE:  We'll leave

12             them in the record, but I'll just withdraw

13             my questions on them.

14                    MS. TODD:  Okay.

15   BY MS. VIGILANTE:

16   Q.       On April 8th, 1996, two other probationary

17   trainees, Brian Bonsall and Phil Marcantonio, were

18   sent for DPS training, and I understand that DPS is

19   a delivery system for the mail.

20                    Was it you that determined

21   that those two employees would go for that training

22   at that particular time?

23   A.       No.

24   Q.       Who made that decision?

            FARRELL COURT REPORTING  (610) 584-8787

240

1                    JEFFREY SCHOCH - DIRECT

2    A.        Delivery supervisor.

3    Q.        Ken Sands?

4    A.        Yes.

5    Q.        Were you informed by Mr. Sands at any time

6    that Mr. Hoffman was not going to be sent for that

7    training?

8    A.        Not that I recall.

9    Q.        Is it routine that probationary employees

10   are sent for the training when it is available during

11   their probationary period?

12   A.        Normally, it's covered right in their first

13   two -- well, one week they go to a carrier class for

14   a couple days, and it's usually covered in there, and

15   DPS came right after Hoffman went through training.

16   DPS came to our training, and we had on-the-job

17   instructors in Phoenixville, and that may be the

18   reason why we decided to have them trained in the

19   office.

20   Q.        Do you know whether or not Mr. Hoffman got

21   that training in his academy training?

22   A.        I don't believe he did.

23   Q.        And was it decided that he wasn't going to

24   be sent for training because he wasn't going to be

FARRELL COURT REPORTING  (610) 584-8787

A-17

241

1                    JEFFREY SCHOCH - DIRECT

2    retained as an employee?

3    A.        I think at that point they were discussing

4    if that was going to help him on the street, because

5    DPS is handled on the street, and the issue at hand

6    was his office performance of casing mail, where, you

7    know, the biggest part of a carrier's day is to be

8    speedy in the office to get yourself on the street

9    for delivering the mail, and that was the biggest

10   issue.

11   Q.        Um-hmm.  Did you at some point while

12   Mr. Hoffman -- at the time that he began his

13   employment, did you receive his Form 50 from the

14   office of personnel management, or whatever the name

15   of it is?

16   A.        Yes.

17   Q.        And that is delivered to you and kept in

18   your office?

19   A.        Yes.

20   Q.        Personnel files for the employee?

21   A.        Correct.

22   Q.        And are those available to supervisors?

23   A.        If I wasn't there in an emergency situation,

24   they have a key that they could get in my office.

263

JEFFREY SCHOCH - DIRECT

1

2  Page 5, but his 50 Form doesn't say that, does it?

3  A.      No.  It could be we just didn't get anything

4  from him at a certain point and they decided to issue

5  the termination.

6  Q.      Miss Bieber on Page 5 looks like that person

7  resigned two weeks into probation.

8  A.      Yes.

9  Q.      Also an older worker?

10  A.      She could not do the job.  She was -- it was

11  not what she expected.

12  Q.      And so she voluntarily resigned during

13  probation?

14  A.      Yes.

15  Q.      Okay.  Were you aware at any time during

16  Mr. Hoffman's probationary period that he was --

17  that comments such as "coo-coo" and "Rambo" and other

18  comments related to stress were directed to him on

19  the floor by other co-workers?

20  A.      No, I was not.

21  Q.      Did you become aware of that later on?

22  A.      After he was issued the termination, he

23  mentioned some things when we were talking, and I

24  said to him, "As I stated when I first hired you, I

FARRELL COURT REPORTING  (610) 584-8787

264

JEFFREY SCHOCH - DIRECT

1
2      told you if anybody -- " -- and I tell this to every

3      employee that comes through for training -- "If

4      anyone is harassing you or anything, you need to come

5      to me because you have to listen to your supervisors

6      and we're the ones that will help get you through

7      your probationary period and help you make it."

8                              You know, if they're on the

9      floor -- and a lot of employees do, they talk to the

10     workers, and I guess they feel comfortable among

11     carriers and they say things to each other, but, I

12     mean, our floor back then was fairly quiet, so there

13     was very little ever said on the floor.

14     Q.      You never observed those comments or heard

15     those comments directly; is that right?

16     A.      No.

17     Q.      Did Mr. Hoffman seem to exhibit nervousness

18     or anxiety while he was casing the mail?

19     A.      Not that I'm aware of. It was more of my --

20     from observing him that he couldn't find an address

21     on the case he was looking.

22     Q.      Did you form an impression based on either

23     your review of his Form 50 or your dealings with

24     Mr. Hoffman that he had some sort of nervous or

FARRELL COURT REPORTING  (610) 584-8787

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NO. 02-CV-3678

KENNETH L. HOFFMAN,                :       ORIGINAL

                                   :

                                   :

                                   :

                Plaintiff,         :

                                   :

        - vs -                     :

                                   :

                                   :

JOHN E. POTTER, POSTMASTER         :

GENERAL, U.S. POSTAL SERVICE,      :

                                   :

                Defendants.        :

- - - - - - - - - - - - - -

                                        - - -

                        SEPTEMBER 11, 2003

                                        - - -

                ORAL DEPOSITION OF KENNETH L. HOFFMAN,
taken by and before LORI SCHMIDT, Professional
Reporter and Notary Public, at the, U.S. DEPARTMENT OF
JUSTICE, U.S. Attorney's Office, Eastern District of
Pennsylvania, 615 Chestnut Street, Suite 1250,
Philadelphia, Pennsylvania, commencing at 11:40 a.m.,
on the above date.

                CAPITAL COURT REPORTING, INC.
                    1431 Lombard Street
                Philadelphia, Pennsylvania  19146
                    (215)  732-0800

Kenneth L. Hoffman
September 11, 2003

1    give the business up.

2          That I would go out and get into a different

3    trade to sales, a corporate sales.  And that's what

4    I did.

5    Q.    Okay.  All right.  We briefly talked about

6    your medical history, being discharged from the

7    navy.  You said you were diagnosed with anxiety?

8    A.    Yes.

9    Q.    Okay.  And did they prescribe any medication

10   for you?

11   A.    Well, no, they didn't.  When I got out, I

12   never even accepted it.  I was -- I could have

13   collected a ten percent disability pension.  I could

14   have collected.  I could have gotten my medicines

15   for free.

16          But what I did I so called buried the

17   hatchet.  I went on with my life.  I got it out of

18   my mind.  I went back to work, got a nice job with

19   an industry.  I went in business for myself, then I

20   got married and raised -- I got this out of my mind

21   this, you know, this anger or whatever you want to

22   call it.

23          I didn't need any medications at that time.

24   Q.    Okay.

Kenneth L. Hoffman
September 11, 2003

```
 1    A.       Never went for help because I didn't need
 2    any.  You're better off burying the hatchet and
 3    forgetting the situation.
 4    Q.       Okay.
 5    A.       That's the way it is.  Understanding I had
 6    high blood pressure.  Maybe my blood pressure I got
 7    it checked several times, but not from a military
 8    doctor, a VA doctor, outside doctor.
 9             I think maybe I got on blood pressure
10    medicine.  I remember when I worked in the sales
11    job.  But it's no different than anybody else.  I
12    take the pill.  It's been normal since I've been
13    taking the pill, see.  But that's the only
14    medications I was on for years.
15    Q.       Okay.  So while you were at Eastern Waste
16    Mangement, you weren't taking any medication for
17    anxiety?
18    A.       No.  No more than just a blood pressure
19    pill.  And I don't know if you want to call that
20    anxiety.  But that's the only medications I took,
21    medication for blood pressure.
22    Q.       Okay.  And when was the first time you began
23    taking medication for anxiety?
24    A.       For blood pressure, you're saying?
```

Kenneth L. Hoffman
September 11, 2003

1    Q.       No.  For anxiety?

2    A.         For anxiety?  If I recall it was -- I can't

3    remember all the dates now.  But it was sometime

4    after the -- after the -- I forget the date exactly

5    when I went up to the VA to get my -- to get my

6    anxiety medicines.  And to get some help.

7    Q.       Okay.  It doesn't have to be exact.  If you

8    can just tell me approximately when that was?

9    A.         '95, maybe '94.

10   Q.       So it was when you were working for whom?

11   A.         I wasn't working.  I think I was laid off at

12   that particular time.  I had took the test for the

13   United States Post Office.

14   Q.       I'm just trying to figure out when you

15   started taking the medication for anxiety?

16                  MR. GOLDNER:  Well, he said '94, '95,

17           so I object.  Asked and answered.

18                  MS. UYGUR:  Well, objection as to

19           form.

20                  THE WITNESS:  Okay.  '94, '95.  Not

21           while I was working for the other people.

22    BY MS. UYGUR:

23   Q.       Who are the other people you're talking

24   about?

Kenneth L. Hoffman
September 11, 2003

1    A.        For Eastern.

2    Q.        Okay.  So it wasn't when you were working

3    for Eastern --

4    A.        I don't remember.

5    Q.        Okay.

6    A.        I don't remember.  I don't have those

7    records and times together with what was what.  I

8    can't remember dates.

9    Q.        Okay, '94 or '95.  What prompted you to seek

10   mental health assistance at that time?

11   A.        What prompted me was because I took the test

12   for the post office and I passed it.  And I was so

13   happy that they called me in for an interview.

14             And they called me in over at North Whales.

15   And I went over there hoping that I was going to get

16   a job.  And I get a preference for ten points.  I

17   believe you know that.  If you're a veteran, you get

18   ten extra points.

19             And you get another ten points if you're a

20   disabled veteran.  So I told them that I got out

21   with a ten percent disability.

22   Q.        Who did you tell?

23   A.        Who did I tell?  On my records, I believe it

24   was on there.

Kenneth L. Hoffman
September 11, 2003

1    **Q.        What records?**

2    A.        The postal records.

3    **Q.        Okay.**

4    A.        I went over there for a job.  They

5    interviewed other people.  They didn't give me the

6    job.  They sent me home.  It was at North Whales.

7             They told me that they took ten points away

8    from me.  They said because you're not collecting

9    money from the VA, you're not entitled to these ten

10   extra points of the score.

11            So they hired the other fellows.  Which I

12   had a hire score than them with the ten points.

13   They hired the other guys.  They sent me home.

14   Bye-bye.

15   **Q.        What year was that?**

16   A.        '94, '95, somewhere around there.  It's on

17   record.  Then they sent me home.  They sent me back.

18   I was frustrated because all I wanted was a job to

19   feed my family.  Then I had nowhere else to go but

20   up to the VA to seek help and to seek medicine.

21   **Q.        Oh, so the reason you went to the VA was you**

22   **weren't collecting benefits and you needed to**

23   **collect the benefits for the ten points so you could**

24   **get the veteran's preference for the postal**

Kenneth L. Hoffman
September 11, 2003

1    application; is that correct?

2                    MR. GOLDNER:  Objection to form.  You

3         can answer.

4                    THE WITNESS:  What did you say?

5    BY MS. UYGUR:

6    Q.    So you testified earlier that you didn't get

7    the ten points when you applied at North Whales

8    because you weren't collecting disability benefits,

9    the ten percent disability benefits --

10   A.    Yes.  They said because I'm not collecting

11   disability benefits, you're not entitled to.

12   Q.    The extra points?

13   A.    Right.

14   Q.    So as soon as you were turned down because

15   you didn't get the extra points, that was the reason

16   that you went to the VA Hospital in order to put in

17   an application to collect ten percent benefits; is

18   that correct?

19   A.    Yes.  Yes.  That was the reason.

20   Q.    Okay.

21   A.    And at the time that I went I was frustrated

22   because I didn't get the job.  And they seen it.  So

23   they put me on -- they put me on medication.  They

24   put me on proper medications that they felt was good

Kenneth L. Hoffman
September 11, 2003

1    again?

2    A.        When did I work again?  Next job was United

3    States Post Office.

4    Q.        Okay.  So did you apply again?  Did you take

5    the test again?

6    A.        No.

7    Q.        Okay.  Tell me how that happened?  What's

8    your recollection?

9    A.        Because when they granted me my percentages,

10   I kept calling and calling and calling.  The main

11   office up there.  Lancaster?

12            Anyway I pursued the job.  I kept saying

13   hey, now I have my ten percent.  This is my records.

14   I want a job.  I didn't leave these people go

15   because I wanted a job.

16            If I think I want to do something I go for

17   it.  And I just kept after them and after them and

18   after them until I got my percentage back, entitled

19   me to ten other points.

20            I said here you are post office, now give me

21   my other ten points and give me a job.

22            And a few months in the mail, I get a letter

23   in the mail of a position in the Phoenixville.  I

24   think I had several choices I could pick, where I

Kenneth L. Hoffman
September 11, 2003

1    these actions.

2    Q.      Did you complain to the supervisor?

3    A.      No, I didn't say anything to the supervisor.

4    He heard and seen it himself.

5    Q.      Okay.  And the verbal comments you just

6    testified about, who is making the verbal comments?

7    A.      Well, there's a lot of fellows there that

8    are in there little bins and they're yelling things

9    out.  You hear voices.  You don't really see the

10   faces.  Then, again, I mean, everybody heard the

11   voices.

12   Q.      Is there anything else you want to add

13   besides those verbal comments and wearing the wig?

14              MR. GOLDNER:  Objection to form.  You

15          can answer the question.

16              THE WITNESS:  Oh.

17    BY MS. UYGUR:

18   Q.      Is there anything else that you found

19   objectionable going on while you were working at the

20   postal service?  Don't repeat what you've already

21   gone through.

22   A.      Well, you know, you're supposed to have

23   three days consecutive training, they tell me, when

24   you first get hired.  They didn't give me three days

Kenneth L. Hoffman
September 11, 2003

```
 1              MS. UYGUR:  Objection.  Form.
 2    BY MR. GOLDNER:
 3    Q.        You can answer the question.
 4    A.        Well, probably because I was a veteran.  You
 5    know, because -- I feel because they -- that I was a
 6    veteran.  And they label people.  People label
 7    Vietnam Veterans as koo-koo, rambo.  They think it's
 8    a joke.  Going postal.  They think it's funny.  They
 9    like to mock.
10              How do I know they directed it towards me
11    you said?
12    Q.        Yeah.
13    A.        I'm a grown man.  Grown man would know when
14    somebody's hassling them or making fun of them.  I'm
15    not a child.
16                  MR. GOLDNER:  That's all I have.
17                  MS. UYGUR:  Thank you, Mr. Hoffman.
18                  THE WITNESS:  Thank you.
19                      -  -  -
20              (Whereupon, the deposition was
21              concluded at 3:40 p.m.)
22                      -  -  -
23
24
```

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NO. 02-CV-3678

KENNETH L. HOFFMAN, :
 :
 :
 :
   Plaintiff, :
 :
 - vs - :
 :
 :
JOHN E. POTTER, POSTMASTER :
GENERAL, U.S. POSTAL SERVICE,:
 :
   Defendants. :

- - - - - - - - - - - - - -

- - -

SEPTEMBER 11, 2003

- - -

   ORAL DEPOSITION OF JOSEPH BONNER, taken by
and before LORI SCHMIDT, Professional Reporter and
Notary Public, at the U.S. DEPARTMENT OF JUSTICE, U.S.
ATTORNEY'S OFFICE, Eastern District of Pennsylvania,
615 Chestnut Street, Suite 1250, Philadelphia,
Pennsylvania, commencing at 10:25 a.m., on the above
date.

   CAPITAL COURT REPORTING, INC.
   1431 Lombard Street
  Philadelphia, Pennsylvania  19146
   (215)  732-0800

Joseph Bonner
September 11, 2003

1   A.       Correct.  I mean that's a management

2   function.

3   Q.       Okay.  Fair enough.  Now, did you -- where

4   did you -- actually strike that.

5            Explain to me how you did it, how you

6   started your 1750, what was the procedure?

7   A.       Well, in other words, the 1750's would come

8   in, and then we set up a time for the new employee

9   to come in.

10  Q.       Okay.

11  A.       And then we take them up to a conference

12  room.

13  Q.       Okay.

14  A.       I'd sit down there.  And I think it had six

15  items on it or something like that.  I don't

16  remember now.  Seven items on the 1750.

17           I would go over each one, then I would

18  transcribe a little more information on to a yellow

19  sheet of paper.

20  Q.       Okay.

21  A.       Line paper and explain it again, and then I

22  would have the employee initial that he understood.

23  Then at the end of the converstaion I would ask him

24  if he had any questions or anything.

Joseph Bonner
September 11, 2003

1   Q.      This procedure of going over the 1750, and

2   then transcribing it and getting the employee to

3   sign, was that your own procedure or had you been

4   taught that?  Or how did that procedure come about?

5   A.      I just thought to me it was better, I mean

6   as opposed to just doing the 1750.  It was so vague.

7   Q.      Okay.

8   A.      I wanted to do a little more -- get a little

9   more information to the individual.

10  Q.      All right.  How long had you been doing

11  1750's with new employees in '96, for how many

12  years?

13  A.      Eight.

14  Q.      Okay.

15  A.      Roughly I mean.

16  Q.      Fair enough.

17  A.      You don't get that many new employees over a

18  course of time anyway.

19  Q.      Okay.

20          MR. GOLDNER:  Let's mark this

21          Bonner-4.

22                          - - -

23          (Whereupon, Exhibit Bonner-4 was marked

24          for identification.)

Joseph Bonner
September 11, 2003

1    categories; A. Work Qantity.  B. Work Quality.  C

2    Dependability.  D. Work Relations.  E. Work Methods.

3    And F. Personal Conduct.

4          Did I read those correctly?

5    A.      Correct.

6    Q.      You explain each of those things, and then

7    you transcribe them sort of while you explain them

8    to the probationary, the new employee and you line

9    up the A, B, C, D, E, F so they understand what

10   you're talking about; is that correct?

11   A.      Correct.

12   Q.      And this is in a conference room upstairs

13   off the floor?

14   A.      In Phoenixville, yes.

15   Q.      Okay.  About how much time do you spend with

16   the new employee going over the 1750 when they

17   start?

18   A.      Gee, I never timed it.

19   Q.      I mean are we talking an hour, two hours?

20   A.      No.  I would think probably a half hour.

21   Q.      Half hour?

22   A.      Fourty-five minutes, something like that.

23   Q.      Okay.

24   A.      And I don't rush through it, you know.

Joseph Bonner
September 11, 2003

```
 1   Q.      Okay.  There's no other form that you fill

 2   out that you've done this other than the form

 3   itself; is that right?

 4   A.      The 1750?

 5   Q.      Yes, sir.

 6   A.      Correct.

 7   Q.      Okay.  Who do you give the 1750 to?  Or who

 8   did you back in '96 when you did them?

 9   A.      I assume I might have handed them to Kenny

10   to put in their folder.  I would have had a folder

11   form with this in it.

12   Q.      Kenny Sands?

13   A.      Kenny Sands or I might have handed it to

14   Jeff.

15   Q.      Okay.  Did you do 1750's for new clerical

16   personnel too?

17   A.      Well, in other words, if Kenny was tied up,

18   I'd handle them, yeah.  But the clerks I would

19   definitely do.

20   Q.      You would do the clerks?

21   A.      Yeah.

22   Q.      You would do the letter carriers to?

23   A.      Right.

24   Q.      Okay.  Did Kenny ever do the 1750's, the
```

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NO. 02-CV-3678

KENNETH L. HOFFMAN,                    :
                                       :
                                       :
                                       :
                Plaintiff,             :
                                       :
            - vs -                     :
                                       :
                                       :
JOHN E. POTTER, POSTMASTER             :
GENERAL, U.S. POSTAL SERVICE,          :
                                       :
                Defendants.            :

- - - - - - - - - - - - - - -

- - -

AUGUST 20, 2003

- - -

     ORAL DEPOSITION OF KEVIN M. CEPKO, taken
by and before LORI SCHMIDT, Professional Reporter and
Notary Public, at the LAW OFFICES OF HAROLD M.
GOLDNER, 1420 Walnut Street, Suite 1500, Philadelphia,
Pennsylvania, commencing at 10:02 a.m., on the above
date.

CAPITAL COURT REPORTING, INC.

1431 Lombard Street

Philadelphia, Pennsylvania  19146

(215)  732-0800

Kevin M. Cepko
August 20, 2003

1    having any written orders given to me.

2    Q.      Okay.

3    A.      There could have been, but I just can't

4    remember.

5    Q.      Okay.  Can you tell me what casing means?

6    A.      It's putting mail in to the case, sorting it

7    basically in order.

8    Q.      And a case, what's a case?

9    A.      It's a combination of few shelves that the

10   carriers would set their mail, letters and magazines

11   in order in dividers.  So if you were casing mail

12   you would be putting in it order, pushing it in the

13   case.

14   Q.      Okay.  All right.  And what is the mail

15   taken out of to be put in to the case?

16   A.      Trays and tubs.  Like hard plastic trays and

17   tubs for magazines.

18   Q.      Okay.  How does the mail get in to those

19   tubs?

20   A.      The clerks sort them.

21   Q.      Do the clerks sort them in to -- what do the

22   clerks sort them in to?

23   A.      Well, they have big shelves and bins they

24   put the stuff in.  Small ones for letters.

Kevin M. Cepko
August 20, 2003

1    A.        I'm pretty sure that's the time.  I was late

2    shift supervisor, so it was around nine, 9:30,

3    something like that.

4    Q.        So if you assisted Ken Hoffman with casing,

5    would that had to have been third class mail?

6    A.        It could be first in the morning.  Because

7    most of those carriers, they leave somewhere around,

8    11, 10:00.  So there was probably still mail there

9    to be cased.  But if he was casing mail in the

10   afternoon, then it had to be third class.  It wasn't

11   first.

12   Q.        As you sit here today, I realize it's seven

13   years ago, did you assist Ken Hoffman with his

14   casing?

15   A.        Yes.

16   Q.        Okay.  Do you remember how many times you

17   assisted him?

18   A.        It was pretty many times.  I was trying to

19   coach him.  Talking to him a lot.  Showing him

20   better ways, easier ways to case, to break up the

21   case.  First half of the route, second half of the

22   route.  If you know it for the first half of the

23   route, case it.  But if it's not, then just put it

24   down and come back to it.

Kevin M. Cepko
August 20, 2003

1        I don't know how many times though.  I can't

2    remember it was too long ago.

3    Q.      Okay.  Well, you said pretty many times, and

4    I just sort of want to get a sense of that.  We're

5    talking more than a dozen?

6    A.      I don't know what we're talking about.  It

7    was a handful of times maybe six to a dozen.

8    Q.      Fair enough.  And how much time would you

9    spend with him each time you assisted him?

10   A.      I'm not sure.

11   Q.      Did you ever discuss with him any particular

12   target time?  That's a really bad question.  I'll

13   withdraw that and try again.

14        Did you ever discuss with him a target rate

15   of casing?

16   A.      I'm not sure.

17   Q.      There is a target rate of casing in which

18   letter carriers are expected to case their mail,

19   isn't there?

20   A.      There's a standard.

21   Q.      Do you know what that is?

22   A.      Eight magazines per minutes and 18 letters

23   per minute.  Eight and 18, I guess it is.

24   Q.      Okay.

Kevin M. Cepko
August 20, 2003

```
 1   whichever the collections time were.

 2          And I had to get those three or four boxes

 3   tapped, and then mail on the dispatcher before 6:00.

 4   So I think we sent a regular carrier out to do it,

 5   just to make sure we got that sweep of mail on the

 6   truck.

 7   Q.      Because he hit them early?

 8   A.      Yeah, more or less.

 9   Q.      Okay.  Mr. Cepko, thank you very much.

10   A.      All right.

11                              - - -

12          (Whereupon, a short break was taken.)

13                              - - -

14          MS. UYGUR:  Okay.  We're back on the

15          record.

16   BY MS. UYGUR:

17   Q.      Nuriye Uygur from the U.S. Attorney's Office

18   representing the defendant.

19          Do you know what the performance standards

20   are that must be met for letter carriers in order

21   for them to pass the probationary period?  Do you

22   know what those are?

23   A.      The standards, yeah.

24   Q.      Okay.  What are they that you understand?
```

Kevin M. Cepko
August 20, 2003

```
 1   A.      Well, to be able to case and carry the route

 2   in 90 days, at least one route.  The standard is

 3   that they use today for a carrier to be able to case

 4   and carry three routes, one every 30 days in 90

 5   days.  You're supposed to be able to case and carry

 6   three routes.

 7   Q.      Okay.  Was Mr. Hoffman ever able to meet

 8   that standard?

 9   A.      I think he couldn't even do one of those

10   routes in eight hours.

11   Q.      Okay.  Now, you testified on direct that

12   Mr. Hoffman related to a nervous condition.  To what

13   were you referring when you said nervous condition?

14   A.      Well, he just seemed worried about losing

15   his job.  But as far as a condition, I'm not a

16   doctor.  You know, he was worried about losing his

17   job.

18   Q.      Okay.

19               MS. UYGUR:  That's all I have.

20               MR. GOLDNER:  I don't have anything

21        else.

22                            - - -

23               (Whereupon, the deposition was

24        concluded at 11:00 a.m.)
```

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NO. 02-CV-3678

KENNETH L. HOFFMAN,        :

                          :

                          :

                          :

             Plaintiff,    :

                          :

       - vs -          :

                          :

                          :

JOHN E. POTTER, POSTMASTER   :

GENERAL, U.S. POSTAL SERVICE,:

                          :

        Defendants.   :

- - - - - - - - - - - - - - -

- - -

AUGUST 20, 2003

- - -

       ORAL DEPOSITION OF JEFFREY SCHOCH, taken by and before LORI SCHMIDT, Professional Reporter and Notary Public, at the LAW OFFICES OF HAROLD M. GOLDNER, 1420 Walnut Street, Suite 1500, Philadelphia, Pennsylvania, commencing at 11:10 a.m., on the above date.

CAPITAL COURT REPORTING, INC.

1431 Lombard Street

Philadelphia, Pennsylvania  19146

(215)  732-0800

Jeffrey Schoch
August 20, 2003

```
 1   came back off the street to instruct them what they

 2   were supposed to do, get off the street or put

 3   somebody else out on the street.

 4   Q.      Okay.  And if I understand it, in the middle

 5   of '96 or at least when Mr. Hoffman was at

 6   Phoenixville Post Office, the early or clerk

 7   supervisor was Joe Bonner?

 8   A.      Yes.

 9   Q.      And the delivery supervisor was Ken Sands?

10   A.      Correct.

11   Q.      And Kevin Cepko was the mid shift

12   supervisor?

13   A.      For a little bit.  He was a carrier from

14   Pottstown just training to get experience as a 204B

15   supervisor.

16   Q.      Excellent.  Okay.  Do you know who Phil

17   Marcantonio is?

18   A.      Yes.

19   Q.      Who is he?

20   A.      He's a letter carrier at the Phoenixville

21   Post Office.

22   Q.      Is he still there?

23   A.      Yes, he is.

24   Q.      And how about Brain Bonsall?
```

Jeffrey Schoch
August 20, 2003

1    hired?

2    A.       Yes.

3    Q.       And what is it anticipated is going to

4    happen at the end of those 90 days?

5    A.       Well, it's anticipated that the person will

6    be successful, completed and move on.

7    Q.       Is there a standard why which perspective

8    letter carriers are measured?

9    A.       During the interview process I go over, you

10   know, they have to be able to lift 70 pounds.  They

11   have to be able to carry a sachal that weighs 35

12   pounds when they're on the street.

13            And when they're in the office, they're

14   expected to case, minimal standard for casing

15   letters is 18 letters a minute.  And flats is eight

16   flats a minute.  And the eight flats a minute is

17   under the old standard.  We actually used to stack

18   letters one at a time on top of each other, and then

19   you would actually fan them out and stick them

20   together.

21            Well, when he started we already had them

22   that you actually cased them right in a case, so

23   they were actually lined up.  So anybody should have

24   picked up more time in that part because most people

Jeffrey Schoch
August 20, 2003

1   A.      Correct.  Well, as far as flats and -- well,

2   now the DPS mail does come sorted by a machine, that

3   is in order.

4   Q.      DPS?

5   A.      Yeah.  It's a machine that actually puts all

6   the mail in sequence.  The carrier doesn't even

7   touch that.  It sits in trays.  When they're walking

8   out to their route that's when they pick up the

9   trays.

10  Q.      It's like the circulars but --

11  A.      No.  It's like the stuff that we normally

12  case manual into a case and put in order, we have

13  machines that do that and it sorts like eight

14  letters a second.  So that's time that was taken

15  away from the carriers.

16  Q.      In the first class?

17  A.      First class and third class.  But it already

18  puts it into numerical order.  That's why you like

19  to have your ZIP plus four on an envelope.  The four

20  digits actually gets it to certain 100 blocks, you

21  know, a street, and then it gets to a certain sector

22  of a block.

23          And we actually use six digits.  The last

24  two are your last two numbers of your house number.

Jeffrey Schoch
August 20, 2003

1    So that's how the machine reads it and puts it right

2    in order.  It goes through the machine four times

3    before it sorts it.

4    Q.      And the bar coding --

5    A.      It prints a bar code on it and that's what

6    the machine actually reads.  It prints that on it.

7    And sometimes if you turn an envelope around you'll

8    see orange dots.  It puts an orange thing on the

9    back too.  And what happens if you cancel it, later

10   on you take that reject mail, put it through a

11   machine that reads the orange codes and re-sorts it

12   for you.

13   Q.      So in early '96 then, would a letter carrier

14   sorting first class mail, would he receive a tub

15   with presorted first class mail that he --

16   A.      He would get tubs of flats and he would get

17   manual letters that the machine couldn't sort.

18   That's what he would case in.

19   Q.      Okay.

20   A.      DPS just started at that point in time.

21   Q.      Oh, was DPS going on in Phoenixville in

22   early '96?

23   A.      It just started at that time.

24   Q.      Do you have an independent recollection as

Jeffrey Schoch
August 20, 2003

1    to whether Mr. Hoffman had any training with DPS?

2    A.      I think DPS came in at the end of his

3    training, DPS and the supervisor chose not to send

4    him down for his training.  We don't send people for

5    training anymore.  We do it all in-house.

6    Q.      But back then --

7    A.      They had something because it was new.

8    Q.      Was that the DPS training that Mr. Bonsall,

9    Mr. Marcantonio got that Mr. Hoffman did not get?

10   A.      Yeah.  What it is is back then we had the

11   carriers training -- or back then they didn't send

12   them to a training site unless you were branded.

13   They just showed everybody, these are different

14   techniques you should try.  There was not one set

15   method.

16           You had to try to hold extra bundles of

17   letter in your hand.  Because you used to hold one

18   bundle, now you had to hold two separate bundles.

19           Okay.  But initially they came out and

20   showed everybody the different style.  Anybody new

21   for a short period of time went down, then that got

22   fazed out, because they went back to a carrier

23   county which that's how they came about with

24   trainers in your building.

Jeffrey Schoch
August 20, 2003

1    Q.      Okay.

2    A.      And that's where you were supposed to use

3    your local trainer.  They got away with and now they

4    got rid of it again.

5    Q.      All right.  Mr. Hoffman was hired as a

6    letter carrier?

7    A.      Yes.

8    Q.      So it was anticipated that he would be

9    casing how many, at the end of his 90 days, how many

10   routes was he expected to be able to case?

11   A.      When I interview the letter carriers, I tell

12   them our goals are that you should be able to case

13   and carry two full routes, but you should be able to

14   carry a third route in the time that's designated

15   for street time.

16   Q.      You should be able to case and carry per

17   day?

18   A.      No.  No.  No.  No.  In your whole 90 days

19   you should be able to go over and work on like one

20   route today, do it in eight hours.

21           And then you should be able to do a second

22   route if you have to work a different day.  And you

23   should be able to show that you've come that far

24   that you got better to do that.  Okay.  And then as

Jeffrey Schoch
August 20, 2003

1    far as just casing, having somebody getting the mail

2    ready and you carrying the street time to make that

3    street time.

4    **Q.        Okay.  But not all on the same day?**

5    A.        No.  No.  No.  No.

6    **Q.        All right.  And is there a protocol that**

7    **indicates what training should be done in what order**

8    **for each letter carrier?**

9    A.        Well, before we get the carriers at our

10   office when they're hired they go to two types of

11   training.

12            They go one to learn about the post office.

13   And they choose their health benefits and stuff like

14   that.  The next week they go to what they call a

15   carrier academy where they have actual carriers that

16   have been selected to teach everyone how to case

17   mail, about accountables and stuff.

18            So before we get them they go through a

19   training academy.  Now, at the time we had

20   additional trainers in the office.  This was

21   something new.  So when they came in instead of just

22   going over to another carrier like they do now, they

23   went to the carrier who the union pointed as being

24   an experienced person to train people.

Jeffrey Schoch
August 20, 2003

1        And they taught them how to stand, to hold

2    the mail, to case it.  You know, and they were told

3    they had to be able to make the 18 letters a minutes

4    and the eight flats a minute.

5    Q.        Who is the individual who did that in

6    Phoenixville in early '96?

7    A.        Ken Sands.  Oh, you mean the trainer?

8    Q.        The trainer.

9    A.        I believe it was Bruce Fullner (ph) and Will

10   Garner.

11   Q.        Okay.

12   A.        I think Bruce taught the mounted routes and

13   Will taught the walking routes.

14   Q.        Okay.

15   A.        Normally in Phoenixville when you're new you

16   do walking routes.  It takes about ten to 12 years

17   to get the mounted routes.

18   Q.        Okay.  And that's a function of seniority?

19   A.        Yes.

20   Q.        Now, how soon after a letter carrier starts

21   from their probation period do you intend for them

22   to be casing a route?

23   A.        Well, normally we try to get them to case in

24   the afternoon with third class mail.  Because we

Jeffrey Schoch
August 20, 2003

1    them up front because there's regulars on each

2    route.

3    Q.      So a trainee, the first time they come in to

4    the actual post office when the training is done,

5    they have to swipe in on --

6    A.      728.

7    Q.      And then who are they going to report to?

8    A.      Well, they'll go to the supervisor who will

9    take them over and introduce them to another

10   carrier.  And then they'll spend probably two days

11   with that carrier the first time.

12   Q.      So typically if they're a letter carrier,

13   they'll swipe on 728, report to the delivery

14   supervisor?

15   A.      Yes.

16   Q.      So in early '96 that would have been Ken

17   Sands?

18   A.      Correct.

19   Q.      And then Mr. Sands would then set them up

20   with a carrier?

21   A.      Yes.

22   Q.      And then they would at least initially go

23   out with that carrier for a couple of days?

24   A.      Yes.

Jeffrey Schoch
August 20, 2003

1    pencil's actually written over on a plastic strip.

2    Q.      Sort of like dividers in a notebook or

3    something like that?

4    A.      It's like clear piece of plastic that snaps

5    over top of that piece of paper.

6    Q.      Well, do you particularly recall whether

7    Route 11's labels were difficult or problematic?

8    A.      I didn't think they were a problem.  I mean

9    that's what Jim Cassano had to case too.  I know

10   Route 22 has the same thing.  Route 21 has the same

11   thing.

12          Just this last inspection we got rid of

13   those labels off of both those routes.  And I'm sure

14   down the road they'll all be back on again.

15   Q.      Was there an evaluation process for

16   probationary employees?

17   A.      Yes, there is.  What they do is the

18   supervisor sits down and sets goals for them for the

19   first 30 days.  After 30 days, they bring the

20   individual in and they sit down and they tell them

21   how the first 30 days went.  Compared to what goals

22   they set for them.

23          And normally I tell them right up front, you

24   know, the first 30 days it's hard to give you a good

Jeffrey Schoch
August 20, 2003

1    evaluation.  I tell everybody that right in my

2    initial interview up front before they start.

3              Then at 30 days they go over what they've

4    accomplished.  Sit down and tell them what they

5    expect of them at 60 days.

6              And then at 60 days, again, you bring them

7    back in.  And then instead of a 90-day evaluation,

8    they moved it up to what they call an 80-day

9    evaluation because what they've had in the past is

10   some offices tried to give them every benefit of 90

11   days to try and make them make the standards and

12   stuff.  And when it was finally done someone didn't

13   calculate right and they were past 90, so they

14   couldn't terminate them.  So that's how we came up

15   with 80 days.

16   Q.     Okay.  And when was that that they came up

17   with the 80 day, if you know?

18   A.     I would say when we went under Lancaster

19   probably about 1994.  Because before that we were

20   under South Jersey.

21   Q.     Okay.

22              MR. GOLDNER:  What are we up to,

23        Schoch-4.

24                            -  -  -

Jeffrey Schoch
August 20, 2003

1    Q.      Let me ask you.  This seems to be a

2    photocopy of a document that has holes at the top.

3    Was that a pressure sensitive multi part form?

4    A.      Yes.

5    Q.      All right.  And is there a name for that

6    form?  Is there like a number --

7    A.      Usually a number.  I think it actually

8    changed now.

9    Q.      But this is called an employee evaluation or

10   probationary report?

11   A.      Yes.

12   Q.      All right.

13   A.      I want to say 1750.

14   Q.      Okay.  How many copies are made of this

15   document?

16   A.      I'm not sure.  I want to say there's three,

17   but I'm not sure.

18   Q.      Who gets the original?

19   A.      Normally the supervisor.  And he gives one

20   to the employee.  He keeps the other two.

21   Q.      Okay.  And I asked you a really miserable

22   question, so I'm going to ask a better question.

23           This particular evaluation Schoch-6, who did

24   the initial evaluation on March 30, 1996?

Jeffrey Schoch
August 20, 2003

1    form?

2    A.        Correct.

3    Q.        And then the second evaluation and so forth?

4    Okay.  Now, so my question is did you yourself do

5    the March 30, 1996 30-day evaluation of Mr. Hoffman?

6    A.        No.

7    Q.        Did you do the 60-day evaluation of April 3,

8    1996?

9    A.        No.

10   Q.        Do you know who did the March --

11   A.        I believe it was Ken Sands.  I'm not exactly

12   sure because I know Joe Bonner left my office

13   because he got a promotion.

14   Q.        Okay.  And do you know who did the April

15   3rd, 1996 evaluation?

16   A.        I would believe Ken Sands.

17   Q.        Okay.  And do I take it there was no April

18   23, 1996 evaluation?

19   A.        No, I don't think we made it to that date.

20   Q.        Okay.  Now, I'm going to ask you

21   specifically with respect to the example of

22   satisfactory performance levels and the section

23   below, you would agree with me that in the March 3,

24   1996 evaluation he was rated satisfactory on work

Jeffrey Schoch
August 20, 2003

1   Q.      Okay.  So then let's just jump to the April

2   3, 1996 evaluation.

3   A.      You said April 3rd?

4   Q.      April 3rd.  And, again, what I'm basically

5   going to do is ask you about those categories A, B,

6   C and F where he received marks of unacceptable or

7   U.

8           Did you, personally, observe anything to

9   indicate that Mr. Hoffman did not work at a

10  sufficient speed to keep up with the amount of work

11  required by his position?

12  A.      I observed him casing some mail in

13  afternoon.  I spent time helping him.  His problem

14  at the time he was very slow.  He wasn't close to

15  the standards.  He was very slow in that.  And I

16  tried to teach him how to case mail.

17          You know, because at the academy they may

18  teach you one way where being a carrier in the past

19  I know if you took the letters to the left versus to

20  the right, it saves on your hand and goes faster.

21          And at the time the difficulty was his

22  glasses.  He could not read because he had bifocals.

23  And, you know, he kept looking at that.  And that's

24  when I told him about, you know, in best interest

Jeffrey Schoch
August 20, 2003

1    since you have to make these goals you should get

2    new glasses to read the letters and read the cases.

3         Because first you have to take a while to

4    read the letter.  And then after he read the letter

5    he didn't know where to find that address on the

6    case and he's almost have to look at every shelf in

7    the beginning of the day, the middle of the route or

8    at the end of the route.  And that was a big

9    problem.

10   Q.    Okay.

11   A.    As far as on the street, you know, the

12   supervisors -- I did not go out and, personally, see

13   him on the street.  Any issues I did have I saw were

14   at the time where he came back later which is

15   expected, but you should get better as time goes on.

16        And I received some phone calls from

17   customers where, you know, he had a few times where

18   he asked customers where the next address was.

19   Q.    Okay.  All right.  How many times would you

20   say you -- strike that.

21        You said earlier you saw him casing in the

22   afternoon?

23   A.    Yes.

24   Q.    So that would have been third class mail?

Jeffrey Schoch
August 20, 2003

1    through a probationary period.

2    Q.       Okay.  Moving then to dependability.  And

3    there's four examples.  One is completes work

4    assignments without unnecessary supervision.  I

5    guess that would relate back to the casing again and

6    the delivery?

7    A.       Well, I didn't do the evaluation.  But I

8    would assume that became an issue with going out on

9    the street, I believe in the beginning that he had

10   trouble on the street and they had to send help out.

11   Q.       Okay.  There's two things there I sort of

12   want to go over with you.  Did Mr. Hoffman report to

13   work on time?  Were there any issues of tardiness,

14   that you're aware of?

15   A.       I'm not aware.

16   Q.       And when it says demonstrates satisfactory

17   attendance.  Did Mr. Hoffman have any attendance

18   issues during his probation that you were,

19   personally, aware of?

20   A.       Not that I'm aware.

21   Q.       Okay.  Now, D and E he got satisfactory, so

22   let's jump to F personal conduct.  And it says

23   conducts himself in a manner appropriate to the work

24   setting.  Were you aware of any circumstances when

CAPITAL COURT REPORTING

A-58

Jeffrey Schoch
August 20, 2003

1          But normally we don't let somebody stand

2     there because after so long they just lose

3     concentration, they get frustrated.

4     Q.     Now, how many times would you say you went

5     over there and assisted him for say five to ten

6     minutes?

7     A.     I would say probably at least a dozen or

8     more.

9     Q.     Okay.  And when would you say was the last

10    time before April 16th that you assisted him?

11    A.     I would say in the last week I probably

12    spent one or two days over there, you know, just

13    going back over what he hadn't picked up on.

14    Q.     Would you see him more than once a day and

15    go over stuff with him more than once a day?

16    A.     Most of the time it would just be at the end

17    of the day because he'd be on the street delivering

18    the mail or doing other things in the afternoon.

19    Q.     If I understood your answer, the last week

20    before April 16th, you went over there once or

21    twice?

22    A.     I believe I did.  I usually try to really

23    push people to try to help them to get -- to make

24    it.

Jeffrey Schoch
August 20, 2003

1    back and he couldn't carry the mail.  So Mr. Cassano

2    being the regular could case the mail which would

3    leave little mistakes for him to carry on the

4    street.

5           And Mr. Cassano trained him so it would be

6    good that he could go out and carry the same route

7    every day which would give him more advantage to

8    see, you know, improvement time.

9    Q.      Okay.  Do you recall Mr. Bonsall getting

10   more casing time than Mr. Hoffman?

11   A.      I can't even recall Brian.  I know he worked

12   there, but I don't even know how long he was there.

13   Q.      And the time that Mr. Hoffman was there

14   before he got his note of termination, did you ever

15   see any improvement in his casing abilities?

16   A.      No.

17   Q.      And how is casing third class mail different

18   than casing first class mail?

19   A.      Well, again, third class mail has less

20   importance.  It's not going to have somebody's

21   checks or something valuable that's first class that

22   to most people that's important.  The third class is

23   more bulk in this mail of some type which might just

24   be advertisements or something like that.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KENNETH L. HOFFMAN,     )
                                    )
        Plaintiff,         )
                                    )
        v.              )    No.  02-CV-3678
                                    )
JOHN E. POTTER, POSTMASTER   )
GENERAL, UNITED STATES POSTAL   )
SERVICE,                     )
        Defendant.     )

## AFFIDAVIT OF JEFFREY S. SCHOCH

     I, JEFFREY S. SCHOCH, being duly sworn according to law, do depose and state the following:

1.    I am the Postmaster for the Phoenixville Post Office, located at 116 Gay Street, Phoenixville, PA 19460 and have been so for over 10  years.   I have been employed with the United States Postal Service for almost 20 years.

2.    As the Postmaster of the Phoenixville Post Office, my duties include: overseeing the entire operation of the Phoenixville Post Office and management of all postal employees, including three subordinate managers.  I am also responsible for employees hours, office expenditures and budgetary information.

3.    I was the Postmaster at the Phoenixville Post Office while Kenneth L. Hoffman, Brian Bonsall and Phil Marcantonio were all probationary employees, generally covering a time period of February 12, 1996 through April 30, 1996.

4.    Code number 728 represents a clock ring code for office time spent within the Post Office and essentially constitutes casing time for all letter carrier employees.

5.    A supervisor is authorized to change the clock ring record for postal employees; however, the supervisor must enter his/her own social security number in order to change it.  Any change would then be indicated on the clock ring record as an exception and show  the supervisor's social security number.

6.    Based upon my employment experience with the United States Post Office and as Postmaster of the Phoenixville Post Office, the primary office function for a letter carrier to perform is casing mail.

7.    For the time period of February 12, 1996 through April 30, 1996, the following casing times were recorded for Kenneth Hoffman, Brian Bonsall and Phil Marcantonio:

| Probationary Employee | Total Casing Time (AM and PM) |
| --- | --- |
| Kenneth L. Hoffman | 189.39 |
| Brian Bonsall | 75.89 |
| Phil Marcantonio | 114.34 |

8.    The difference between morning (AM Casing)  and afternoon (PM Casing) casing, is that first class mail is cased in the morning, while  third class mail is cased in the afternoon; however, the actual skill of casing is the same, regardless of whether it is first class mail or third class mail.

9.    Kenneth L. Hoffman was provided with 76.30 hours of first class mail casing time (AM Casing) during his probationary employment period.    Likewise, Brian Bonsall was provided 43.34 hours of first class mail casing time (AM Casing) during his probationary employment period;  and Phil Marcantonio was provided with 83.10 hours of first class mail casing time (AM Casing) during his probationary employment period.

10.    Kenneth Hoffman was provided with 107.77 hours of third class mail casing time (PM Casing) during the same probationary period.  Brian Bonsall was provided with 31.12 hours of third class mail casing time (PM Casing) during his probationary employment period; and Phil Marcantonio was provided with 31.24 hours of third class mail casing time (PM Casing) during his probationary employment period.

11.    Kenneth L. Hoffman received approximately 2.5 times more casing time as his fellow probationary employee, Brian Bonsall.  In comparison, Mr. Hoffman received almost 1.6 times more casing time as his fellow probationary employee, Phil Marcantonio.

12.    Although Kenneth L. Hoffman was given more opportunities and hours to case mail as compared to his fellow  probationary employees, he was unable to master this skill, which is a necessary element to perform the job in a satisfactory manner.  During the course of the probationary period, Kenneth Hoffman's street and casing times did not improve.   In essence, Kenneth L. Hoffman was unable to perform an essential function of the job and was therefore terminated near the end

of his probationary period.  Mr. Hoffman was not terminated for any

illegal/discriminatory reasons.

The foregoing information is true and correct based upon my knowledge,

information and belief.

_Jeffrey S. Schoch_
JEFFREY S. SCHOCH

SWORN TO AND SUBSCRIBED before me, a Notary Public, this 26th day of

September, 2003.

_Carolyn Burnett Thompson_
NOTARY PUBLIC

> Notarial Seal
> Carolyn Burnett Thompson, Notary Public
> City Of Philadelphia, Philadelphia County
> My Commission Expires Sept. 11, 2006
> Member, Pennsylvania Association Of Notaries

COPY

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|   |   |
|---|---|
| KENNETH L. HOFFMAN | : **CIVIL ACTION** |
|  | : 02-CV-3678 |
| Plaintiff, | : |
|  | : |
| v. | : |
|  | : |
| JOHN E. POTTER, POSTMASTER GENERAL, | : |
| UNITED STATES POSTAL SERVICE | : |
|  | : |
| Defendants. | : |

HAROLD M. GOLDNER, ESQUIRE
1420 WALNUT STREET – SUITE 1500
PHILADELPHIA, PENNSYLVANIA 19102

## AMENDED COMPLAINT

### Preliminary Statement

1.    The Postmaster at the Phoenixville Post Office discriminated against Kenneth L. Hoffman because he was more than forty years old and was perceived as disabled. He set Hoffman up to fail during Hoffman's ninety day probationary period, and then terminated him based upon pretext. That termination was genuinely motivated by age discrimination and discrimination against the disabled.

### Parties

2.    Plaintiff KENNETH L. HOFFMAN ("Hoffman") is an adult individual, citizen of the Commonwealth of Pennsylvania, who resides at 20 Winding Way, Malvern, Pennsylvania.

3.    Plaintiff Kenneth L. Hoffman is a 52 year-old man who was born on September 24, 1946.

4.    At all times material to this JOHN E. POTTER was Postmaster General of the United States Postal Service, which is an agency bound by all Federal laws regarding equal employment,

23.    The assignments given to Plaintiff were more difficult than those given to the comparators. Respondent deliberately treated Plaintiff disparately so as to intentionally ensure and/or cause Plaintiff to fail probation.

24.    As a result of the disparate treatment of Plaintiff, Plaintiff could not possibly successfully complete his probation, and he was terminated prior to the expiry of such probation, as set forth above.

25.    The USPS appointed at least one other letter-carrier over the age of forty to the Phoenixville Post Office who was also terminated prior to the expiry of his probationary period.

26.    Prior to being hired by USPS Plaintiff had been diagnosed as suffering from a nervous disorder which interfered with various activities of daily living, inter alia, sleeping, resting, performing intensive detailed clerical functions for long periods of time without breaks, as well as impairing his ability to interact with other individuals from time to time.

27.    Said nervous disorder resulted in a rating from the Veterans Administration for the Plaintiff.

28.    Despite said disorder, Plaintiff was able to perform all of the essential functions of his job as a letter carrier for the USPS.

29.    Said disorder could be mitigated at times by appropriate medication, however said medication sometimes itself produced side-effects which affected Plaintiff's activities of daily living.

30.    Notwithstanding the foregoing, Plaintiff was perceived as disabled by his co-workers and supervisors at the Phoenixville Post Office, and he was treated less favorably on the basis of that perception.

31.    From time to time Plaintiff was humiliated, insulted, teased, and otherwise made the subject of harassment which clearly related to his nervous disorder.

HAROLD M. GOLDNER, ESQUIRE
1420 WALNUT STREET — SUITE 1500
PHILADELPHIA, PENNSYLVANIA 19102

4

## CERTIFICATION

| Case No. |
| --- |
| 4C-175-1060-96 |

I have read the attached statement, consisting of ___2___ pages, and it is true and complete to the best of my knowledge and belief. In making this statement, I understand Section 1001, Title 18 of the U.S. Code which states:

"Whoever, in any manner within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device of material fact, or makes any false, fictitious or fraudulent statements or representation, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than 5 years, or both."

### Privacy Act Statement

The collection of this information is authorized by Public Law 92-261, Equal Employment Act of 1972; 29 U.S.C. sections 621 et seq and 701 et seq. and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party of has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits; to a congressional office at your request; to an expert, consultant or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of

Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Provision of the information requested is mandatory for the complainant and for Postal Service and other federal employee witnesses. Failure of the complainant to provide requested information could result in the complaint being dismissed. Failure of Postal Service or other Federal employees to provide requested information could result in disciplinary action. Provision of the information requested by other persons is voluntary and failure to provide such information will result in no adverse effect.

### Oath / Affirmation

Subscribed and (sworn) (affirmed) before me, **_Huie A Douglas:  EEO Counselor/Investigator_**

on this _____ **_day of_** _____ **_1996._**

| EEO Investigator's Signature | Affiant's Signature *(Sign in the presence of EEO Investigator)* |
| --- | --- |

### Declaration

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.

*(Affiant, sign and date if the attached statement was not completed in the presence of the EEO Investigator.)*

| Affiant's Signature | Date |
| --- | --- |
| *Jeffrey S Schad* | 10/28/96 |

PS Form 2571, September 1992 (facsimile)

AFFIDAVIT  *c*

A-67

EEO INVESTIGATIVE AFFIDAVIT

CASE NO. 4C-175-1060-96
RE: KENNETH L. HOFFMAN

1]      Mr. Hoffman was given as much as and probably more training than any other 90 day probationary employee in Phoenixville. He states that the Phoenixville Post Office has a hostile environment. Mr. Hoffman has never brought it to my attention, and he has had several opportunities to talk to me. In fact, at our initial interview I explained to him that if there is anyone telling him to slow down or what ever, he was to come tell me and I would address the problem. Again, he had plenty of opportunities to talk to me and never made mention of any hostile environment. We are one of the larger offices in the district and have the least amount of grievances.

        Mr. Hoffman received more remedial training than other 90 day probationary carriers. Mr. Hoffman spent a lot of time coming in late to carry his route, which would afford him more opportunities to case third class mail while learning the case prior to doing an evening collection. I personally spent some days teaching him how to learn to case mail. He explained to me that he had a hard time adjusting his eyes to the letter case because he wore by-focals and had to keep lifting his head up and down trying to read the numbers. I told him he would be better off getting a pair of glasses for casing, but he never took my advise. For the first 45 days, Mr. Hoffman took approximately one (1) hour to case about 10 minutes worth of work. This was totally un-acceptable, and his times were not improving. Management could not allow or afford him to delay the mail by having him case in the AM and not casing close to standards.

        Mr. Hoffman received all kinds of training for the position of a letter carrier. He was trained at the Carrier Academy on how to drive the three (3) types of postal vehicles and was also trained on how to case and carry mail at the Carrier Academy by union and non-union letter carriers. He received additional training at Phoenixville by two (2) designated carrier trainers on how to case and carry mail. (these were new in Phoenixville, we didn't have them in the past several years). In addition, he was trained by a carrier on the routes he was learning. Management also spent time going on the street with him trying to improve his street time also. We also had Debbie Pitts (Router) try to work with him on improving his casing which helped some, but still never got him up to standards.

        Mr. Hoffman states he was verbally attacked by both craft and management. I have been on the work floor off and on almost everyday during his probationary period and haven't heard anyone verbally attack him. Again, he never told any managers about his accusations. Mr. Hoffman states that these comments were directed at him based on his disability. Management does not have any medical information to review to see what problems he may have. If he shared his problems with fellow workers as he states, management can not be held responsible for things he tells other employee's, the people he should have talked to is management to see if help could have been provided. Management has no knowledge of any of his medical conditions. Medical conditions or any disability that he states had nothing to do with his separation, the removal was based on him not meeting the requirements of his position.

        Mr. Hoffman was given his first expectations by Mr. Bonner (Supervisor). Mr. Bonner ask that I be present since he was transferring to another office(Newtown). Mr. Bonner did explain the seriousness of making sure the complainant understood what was expected of him during his probationary period. He explained to each of the new carriers that recently some carriers were separated during their probationary period and they stated they were never given expectations by management. This time he was going to make sure that each new person fully understood what was expected and had them initial sections so there was no excuses later.

        Mr. Hoffman states that another carrier told him to be careful because management was watching him. I am not aware of who said this but it is true and part of management's job to observe him as we do other workers, especially while their in their first 90 day period. It's not hard for anyone in the building to

AFFIDAVIT C-2

see when a new employee is not improving or making standards, it's their job and there are carrier standards.

Mr. Hoffman states three days prior to his 60 day evaluation he was given the opportunity to case and carry the entire route. Based on his performance up to this point, it was easy to show him that he was not able to meet standards. There was no reason for help, the routes were adjusted and this route was an 8 hour route. At this point, it would have taken Mr. Hoffman atleast 10 to 12 hours to complete this route. This would mean 2 hours at the overtime rate of 1-1/2 and the additional at double time, and the customer getting poor service. He states that the supervisor told him he was not going to make it because he needed help to complete his assignment. Again, the employee is in his probationary period, and talked like everything was OK just because he gave it his best. Management had several discussions with him about his deficiencies and probably just wanted to assure him that his performance was un-acceptable. I was not given this information or statement, but his immediate supervisor did keep me informed on his status.

COLLECTIONS

The Phoenixville Post Office has computerized wands for showing when a carrier arrives at a collection box. This wand is to show if the carrier arrives after the posted time or early. Mr. Hoffman was trained on the wand system by another carrier. He sat in a truck and road with another carrier observing what he was to do. This is considered the easiest job for a letter carrier, emptying collection boxes.

On April 4, 1996 Mr. Hoffman states that there was confusion between managers. Mr. Sands is the early supervisor who is responsible for setting up the initial schedule for the week. PTF schedules can change daily and through out the day, which is common. It is the responsibility of both managers to discuss options for doing daily collections. Things that are considered are: one's total hours in a week to date, will they be in an Overtime status, can we save O.T. by using someone else, there was three new people that were being trained. There are a lot of days we don't have someone scheduled and use the first employee back who is on the O.T. list, or who has the least amount of hours so far in the week.

April 17, 1996 - again, this is what is expected as a PTF, they don't have a set schedule. I am not aware of this date or this situation, but it happens regularly with everyone.

Being a PTF, he can work a split tour. He can be brought in and sent home and told to report later that day. This is in the National Agreement.

As far as any statements made between his immediate supervisor and himself, I was not present for these. I was kept informed by his supervisors on his 90 day probationary period. I also did try to help him learn to case mail, but he did the opposite as instructed.

The only knowledge the Phoenixville office gets is if they are a veteran or not, which only helps them during the hiring stage. As far as medical documentation, we are not given this by the district office. We have no knowledge of any disabilities. All personnel records are kept in my office which is locked when I'm not there.

As far as the DPS Training, his immediate supervisor felt it was not necessary to send him because he was already told what he needed to improve on in the office. His casing is the biggest thing that hurt him. If he could have made a big turn around at the end, then his supervisor would have had him DPS Trained.

The corrective action requested is not proper. Mr. Hoffman was afforded the same and even more training than other new PTF's. He was unable to meet the requirements / expectations set for him.

*Jeffrey S. Schoch*

Jeffrey S. Schoch
Postmaster

AFFIDAVIT C-3